AMOCO PRODUCTION COMPANY
and BP Energy Company,
Petitioners,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent.

Wyoming Interstate Company,
Ltd., Intervenor.

No. 00–1492.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 2, 2001.

Decided Nov. 30, 2001.

Jon L. Brunenkant argued the cause for petitioners. With him on the brief was Cheryl J. Walker. Frederick T. Kolb entered an appearance.

Lona T. Perry, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief was Dennis Lane, Solicitor.

Daniel F. Collins, G. Mark Cook and J. Gordon Pennington were on the brief for intervenor. Howard L. Nelson entered an appearance.

Before: EDWARDS and RANDOLPH, Circuit Judges, and WILLIAMS, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Senior Circuit Judge.

Amoco Production Company and its affiliate BP Energy Company (collectively, "Amoco") appeal from four orders of the Federal Energy Regulatory Commission. We initially address the first three orders, all revolving around the Commission's approval of a rate settlement; we uphold the Commission. Then we address the fourth order, which turns out to be non-final and thus beyond our jurisdiction.

\* \* \*

Amoco produces natural gas and ships some of it through pipelines operated by Wyoming Interstate Company. Wyoming Interstate filed for a rate increase in 1997 under § 4 of the Natural Gas Act, 15 U.S.C. § 717c, and the new rates went into effect subject to refund on December 1, 1997 (Docket No. RP97–375, the "1997 case"). After some procedural wrangling,

the Commission issued an order approving a contested settlement between Wyoming Interstate and all parties except Amoco, which was severed so that it could litigate its interests independently. *Wyoming Interstate Company*, 87 FERC ¶ 61,339 (1999) ("June 1999 Order").[1]

The approved settlement provided different rates for each of two separate periods. *Id.* at 62,305. For Period I, ending December 31, 1998, the rates were the same as the settlement rates approved by the Commission for Wyoming Interstate in a prior case, Docket No. RP94–267 (the "1994 case")—rates lower than those in Wyoming Interstate's 1997 filing. *Id.* The rates for Period II (running from January 1, 1999 until the effective date of Wyoming Interstate's next rate filing, discussed below) were even lower. *Id.*

Shortly after the approval of this contested settlement, Wyoming Interstate filed a new § 4 case, in which it sought new rates effective January 1, 2000 (Docket No. RP99–381, the "1999 case"). As a result, the period covered by the 1997 filing and settlement was "locked-in," i.e., it could not run beyond a known date— here, the last day of 1999.

The Commission saw this new filing as altering the context of the 1997 case. Denying Amoco's petition for rehearing of the settlement approval, the Commission not only stuck to its approval of the settlement for shippers other than Amoco, but extended the settlement to cover Amoco itself. *Wyoming Interstate Company, Ltd.*, 89 FERC ¶ 61,028 (1999) ("October 1999 Order"). Its reasoning was that there was no way that Amoco could benefit from

---

1. The parties have included in the Joint Appendix only typescript versions of the Commission orders under review, rather than the published versions. As our opinions are more communicative to the bar if we cite pages in the published versions, the typescript copies are of little use to us. We have in the past commended use of the published version (blown-up), see *Union Electric Co. v. FERC*, 890 F.2d 1193, 1194 n. 1 (D.C.Cir.1989), and counsel seem generally to have followed our hint.

pursuit of its claims in the 1997 case. It addressed three imaginable types of benefit: (1) For the locked-in period at issue, Amoco could not recover *refunds* under § 4 of the Natural Gas Act because under established law, the "floor" for a § 4 refund calculation would be the prior lawful rate, i.e., the 1994 settlement rates. But the 1997 settlement rates already secured by others were in the case of Period I *the same as* the 1994 rates, and in the case of Period II even *lower*. So Amoco had nothing to gain under § 4. *Id.* at 61,087–88.

(2) Nor could Amoco recover reparations in the 1997 case under § 5 of the Act, 15 U.S.C. § 717d. Given the complexity of Amoco's main issue (whether customers should receive a credit for a nearly $8 million dollar "exit fee" paid to Wyoming Interstate by Columbia Gas Transmission), the Commission could not finish the necessary hearing before the end of the locked-in period. As the Commission can award § 5 reparations only *prospectively* from the date of a finding that rates are not just and reasonable, Amoco had nothing to gain under § 5. *Id.* at 61,088.

(3) Finally, the Commission reasoned, any finding in the 1997 case could not help Amoco with regard to the 1999 case. Again, the "floor" for refund purposes there would be the prior lawful rate. For purposes of the 1999 case, this would be the Period II settlement rates, and Amoco's maximum imaginable success in the 1997 case could not produce a prior lawful rate even that low; apart from the settlement of the 1997 case, there was no basis for any floor lower than the 1994 settlement rates. *Id.* at 61,088–89.

Accordingly, the Commission terminated the hearing scheduled for the 1997 case and approved the settlement for all parties. *Id.* It subsequently denied rehearing. *Wyoming Interstate Company, Ltd.*, 89 FERC ¶ 61,303 (1999) ("December 1999 Order").

\* \* \*

■ Amoco first attacks the Commission's June 1999 Order approving the 1997 settlement as to the parties other than itself. Amoco argues that there was no "substantial evidence" that the settlement rates were "just and reasonable." But this misstates the issue. All the non-Amoco shippers agreed to the settlement. As it was "uncontested" as to them, the only burden on the Commission was to find that it was "fair and reasonable." *United Municipal Distributors Group v. FERC*, 732 F.2d 202, 207 n. 8 (D.C.Cir.1984). See June 1999 Order, 87 FERC ¶ 61,339 at 62,308. The Commission clearly recognized the distinction, and that is why it initially did not force the settlement on Amoco. *Id.* at 62,309–10. Amoco does not even try to argue that there was not substantial evidence to support the Commission's finding that the settlement met the less stringent "fair and reasonable" standard.

■ Amoco's next claim is that the Commission's October and December 1999 Orders erred in concluding that, after Wyoming Interstate's 1999 filing, Amoco had nothing to gain from pursuit of its claims in the 1997 case. Specifically it attacks the third element in the October 1999 Order—the conclusion that a § 5 finding that the "just and reasonable" rates were *below* even the 1997 Period II settlement rates could not benefit Amoco in the 1999 case. Amoco asserts that there is a potential benefit: Such a lower rate, it claims, could become the "floor" for § 4 refunds in the 1999 case.

Amoco's argument fatally confronts the text of § 4(e) of the Natural Gas Act, 15 U.S.C. § 717c. That section provides that in the period after a gas carrier has filed new rates, and the same have been suspended and put in effect subject to refund, the Commission may require the carrier

**1122**

"to keep accurate accounts in detail of all amounts received by reason of such *increase*," and that the Commission may order refunds of "the portion of *such increased rates or charges* by its decision found not justified." § 4(e), 15 U.S.C. § 717c(e) (emphasis added). It was this text that led the Supreme Court in *Federal Power Commission v. Sunray DX Oil Co.*, 391 U.S. 9, 88 S.Ct. 1526, 20 L.Ed.2d 388 (1968), to hold that the refund obligation extends only to rate *increases* found improper. There the Court dealt with whether the Commission could order refunds by carriers that had been charging rates in accordance with a certificate of convenience and necessity under § 7 of the Act, 15 U.S.C. § 717f, in the absence of a condition in the certificate allowing such a refund. The Court looked to § 4, and found that any ambiguity in the refund provision itself ("the portion of *such* increased rates or charges by its decision found not justified") was resolved by the accounting provision, which was limited to "amounts received by reason of such increase." *Id.* at 24 (internal quotes omitted). "If it had been intended that the refund obligation should extend to greater amounts, the accounting requirement logically should have extended to them also." *Id.* The Court went on to point out an anomaly that any other interpretation would create:

It would be anomalous to treat an increased price as a trigger for a refund obligation which would leave the producer with a smaller net return than if it had never increased its price at all.

*Id.*

In *Distrigas of Massachusetts Corp. v. FERC*, 737 F.2d 1208 (1st Cir.1984), the First Circuit applied *Sunray* under conditions virtually identical to ours. Distrigas had been charging a FERC-approved settlement rate, and then filed a rate increase to take effect July 1979. *Id.* at 1222. Adjudicating that filing, the Commission

found that the "just and reasonable" rates were lower than the settlement rate, but refused to order refunds based on a benchmark lower than the pre-July 1979 rate. *Id.* at 1224. The court upheld the Commission. Then-judge Breyer wrote for the court that under *Sunray,* FERC could order refunds only for amounts exceeding "the pre-existing lawful rate," there the settlement rates in effect prior to the 1979 filing. *Id.* Judge Breyer observed that the Court had derived this conclusion "from the language of the statute and from the fact that, otherwise, a firm asking for an increase could end up considerably worse off than if it had not requested one." *Id.*

*Distrigas* applies here. For the 1999 case, the "floor" cannot be lower than the Period II settlement rates. Conceivably Amoco might object that, in distinction to *Distrigas,* the settlement rates governing the 1997–99 locked-in period were neither uniformly agreed to nor found to pass the relatively demanding standards for a contested settlement. But if the 1997–99 settlement rates are removed from the picture, the language of § 4 would drive the Commission back to the 1994 rates—which are *higher* than the Period II settlement rate. Thus any refund "floor" lower than the Period II settlement rate would—in the face of *Sunray* and *Distrigas*—leave Wyoming Interstate "considerably worse off than if it had not" made the 1997 or the 1999 filings.

Amoco also claims that the Commission failed to abide by two of its own precedents—*Panhandle Eastern Pipe Line Co.*, 77 FERC ¶ 61,284 (1996), and *Southern Natural Gas Co.*, 65 FERC ¶ 61,347, at 62,827 (1993). Amoco is mistaken. In those cases the Commission simply recognized that when a carrier files first one § 4 rate increase and then another, the rate found "just and reasonable" in the first case may become the "floor" in the second.

Nothing in either case addressed the situation presented here.

We affirm the Commission's orders approving the settlement for all shippers, including Amoco.

\* \* \*

In response to motions for clarification of the December 1999 Order approving the settlement, the Commission set some ground rules for litigation of the 1999 case. Specifically, it ruled that under the settlement all shippers other than Amoco were bound in the 1999 case by the settlement's resolution of the Columbia exit fee issue discussed above. *Wyoming Interstate Company, Ltd.,* 90 FERC ¶ 61,294 (2000) ("March 2000 Order").

Amoco sought rehearing, arguing that it should be able, if it prevailed in its position on the Columbia exit fee, to have that ruling applied to the rates charged *other* shippers, regardless of their position on the issue. Its reasoning was that those rates severely impacted the price Amoco could obtain at the wellhead. (Thus, for example, it could not normally receive more at the wellhead than the market value in the destination market, less transportation costs.) Amoco saw itself in a position parallel to that of *buyers* at the end of FERC-regulated electricity transmission systems, which under certain circumstances we had held were entitled to challenge rates agreed to by the relevant transmission companies and all the shippers. *Southern California Edison Co. v. FERC,* 162 F.3d 116 (D.C.Cir.1998); *Tejas Power Corp. v. FERC,* 908 F.2d 998 (D.C.Cir.1990). Compare FERC Brief, filed Oct. 9, 2001, in *Interstate Natural Gas Association of America v. FERC,* D.C.Cir. No. 98–1333, at 48 n.12 (observing that "lower prices for transportation under maximum rate regulation translates to a greater share of the delivered price of gas being retained by the producers").

In two orders issued September 27, 2000, the Commission rejected Amoco's argument. *Wyoming Interstate Company,* 92 FERC ¶ 61,256 (2000); *Wyoming Interstate Company,* 92 FERC ¶ 61,257 (2000) ("September 2000 Order"). The first is an order approving the non-Amoco shippers' settlement of the 1999 case, and the second is an order addressed to Amoco's litigation of the 1999 case and denying Amoco's petition for rehearing of the March 2000 Order. Amoco seeks review only of the second.

■ We have no jurisdiction over the September 2000 Order. Although § 19(b) of the Natural Gas Act, 15 U.S.C. § 717r(b), affords authority to review an "order" of the Commission, this has long been understood to encompass only "final" orders. See, e.g., *Canadian Association of Petroleum Producers v. FERC,* 254 F.3d 289, 296 (D.C.Cir.2001); *Papago Tribal Utility Authority v. FERC,* 628 F.2d 235, 238–40 (D.C.Cir.1980) (construing the substantively identical text of the Federal Power Act, 16 U.S.C. § 825l(b), as requiring a final order); *United Municipal Distributors Group,* 732 F.2d at 206 n. 3 (holding that the *Papago* analysis is applicable to the Natural Gas Act). The Commission's position on the indirect-interests issue can affect only the 1999 case, which the Commission has yet to adjudicate.

\* \* \*

The petitions for review of the June 1999, October 1999 and December 1999 Orders are denied, and the petition for review of the September 2000 Order is dismissed.

*So ordered.*