# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued October 7, 2010        Decided December 3, 2010

No. 08-1270

FLINT HILLS RESOURCES ALASKA, LLC,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION AND
UNITED STATES OF AMERICA,
RESPONDENTS

ANADARKO PETROLEUM CORPORATION, ET AL.,
INTERVENORS

———

Consolidated with 08-1271, 09-1025, 09-1026, 09-1030, 09-1031, 09-1033, 09-1215, 09-1222, 09-1223, 09-1229, 09-1232

———

On Petitions for Review of Orders
of the Federal Energy Regulatory Commission

———

*Steven Reed* argued the cause for petitioners Flint Hills Resources Alaska, LLC, et al. With him on the briefs were *Steven H. Brose*, *Daniel J. Poynor*, *Eugene R. Elrod*, *Christopher M. Lyons*, *David D'Alessandro*, *M. Denyse Zosa*, *Patricia F. Godley*, *Jonathan D. Simon*, *Albert S. Tabor, Jr.*, *John E. Kennedy*, *Dean H. Lefler*, *J. Patrick Nevins*, and

*Edward D. Greenberg*. *Dennis Lane*, *James F. Bendernagel, Jr.*, *David K. Monroe*, *Travis A. Pearson*, *Howard E. Shapiro*, and *Richard A. Curtin* entered appearances.

*Bradley S. Lui* argued the cause for petitioner State of Alaska. With him on the briefs were *Deanne E. Maynard*, *Seth M. Galanter*, and *Daniel S. Sullivan*, Attorney General, Attorney General's Office of the State of Alaska. *Bruce J. Barnard* and *Robert H. Loeffler* entered appearances.

*Judith A. Albert*, Senior Attorney, and *Carol J. Banta*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With them on the brief were *Thomas R. Sheets*, General Counsel, and *Robert H. Solomon*, Solicitor. *Robert J. Wiggers* and *John J. Powers III*, Attorneys, U.S. Department of Justice, entered appearances.

*Robin O. Brena* argued the cause for intervenors Anadarko Petroleum Corporation, et al. in support of respondent. With him on the brief were *David W. Wensel*, *Anthony S. Guerriero*, *Joseph S. Koury*, *Jeffrey G. DiSciullo*, *Andrew T. Swers*, *Albert S. Tabor, Jr.*, *John E. Kennedy*, and *Dean H. Lefler*.

*Albert S. Tabor, Jr.*, *John E. Kennedy*, *Dean H. Lefler*, *J. Patrick Nevins*, *Edward D. Greenberg*, *Steven H. Brose*, *Steven Reed*, *Daniel J. Poynor*, *Eugene R. Elrod*, *Christopher M. Lyons*, *David D'Alessandro*, *M. Denyse Zosa*, *Patricia F. Godley*, *and Jonathan D. Simon* were on the brief for intervenors Flint Hill Resources Alaska, LLC, et al. in support of respondents. *James M. Armstrong* entered an appearance.

*Bradley S. Lui*, *Deanne E. Maynard*, *Seth M. Galanter*, and *Daniel S. Sullivan*, Attorney General, Attorney General's Office of the State of Alaska, were on the brief for intervenor

State of Alaska.  *Bruce J. Barnard* and *Robert H. Loeffler* entered appearances.

Before: GARLAND, *Circuit Judge*, and WILLIAMS and RANDOLPH, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*:    This case arises primarily out of the stresses involved in a shift from one system of regulatory ratemaking to another.

For many years the oil pipeline companies owning and operating the Trans Alaska Pipeline System ("TAPS") charged shippers rates based on a 1985 settlement agreement between them (initially six of the carriers, but ultimately all eight) and the state of Alaska.  (Alaska's anticipation of royalties and tax receipts gave it a stake in the matter; the shippers in the early years, by contrast, were largely affiliates of the pipeline companies, and so had little adversity of interest.)    The TAPS Settlement Agreement ("TSA") established the TAPS Settlement Methodology or "TSM," a ratemaking methodology to be used for computing interstate rates until 2011, the end of the pipeline's then projected useful life.  Although no shippers joined the agreement, the Federal Energy Regulatory Commission, by this time the agency with authority to regulate oil pipeline rates under the Interstate Commerce Act, 49 U.S.C. §§ 1 et seq. ("ICA"),[1] approved it

_____

[1] In the Department of Energy Organization Act, Pub. L. No. 95-91, § 402(b), 91 Stat. 565, 584 (1977), codified as 49 U.S.C. § 60502 (2010), Congress transferred regulatory authority over oil pipelines from the Interstate Commerce Commission to FERC.  FERC's regulation of oil pipelines is governed by the ICA as it existed on October 1, 1977.  See Revised Interstate Commerce Act, Pub. L. No. 95-473, § 4(c), 92 Stat. 1337, 1470 (1978).  All references to

as "fair and reasonable and in the public interest." 18 C.F.R. § 385.602(g); see *Trans Alaska Pipeline System,* 33 FERC ¶ 61,064, 61,138 (1985) ("*TAPS I*"); *Trans-Alaska Pipeline System*, 35 FERC ¶ 61,425, 61,977 (1986) ("*TAPS II*"). The Commission's order left shippers free to later protest rates as unjust or unreasonable. *TAPS II,* 35 FERC at 61,977. In practice, the TSM governed the pipeline's interstate rates through 2004.

But when the carriers filed rates for 2005 and 2006, Alaska and two shippers (Anadarko Petroleum for both years, Tesoro Corporation for 2006) protested. Alaska, exercising rights it preserved in the TSA, alleged that the proposed rates violated the non-discrimination and anti-preference provisions of the ICA, as they were higher than the intrastate rates set by the Regulatory Commission of Alaska ("RCA"). The shippers argued that the rates were unjust, unreasonable, and otherwise unlawful. The Commission responded by scuttling the TSM. Instead it applied a methodology that it had developed for oil pipeline ratemaking generally in *Williams Pipe Line Co.,* 31 FERC ¶ 61,377 (1985) ("Opinion No. 154-B").

Stated in very general terms, the Commission's orders found the rates filed for 2005 and 2006 to be unjust and unreasonable, but not discriminatory or unduly preferential. Though deciding that the just and reasonable rates would be below the 2004 rates, it limited refunds, in accordance with § 15(7) of the ICA, to the difference between the 2005 and 2006 filed rates and the prior unchallenged (2004) rate. *BP Pipelines (Alaska) Inc.,* 123 FERC ¶ 61,287 (2008) ("Opinion No. 502"); *BP Pipelines (Alaska) Inc.,* 125 FERC ¶ 61,215

the ICA in this opinion are to that version of the ICA, which can be found in 49 U.S.C. §§ 1-15 (1976), or reprinted in 49 U.S.C. §§ 1-15 (1988).

(2008) ("First Rehearing Order"); *BP Pipelines (Alaska) Inc.,* 127 FERC ¶ 61,317 (2009) ("Second Rehearing Order").

The carriers assert a host of methodological errors in these decisions; we are unpersuaded. Alaska seeks relief against the Commission's refusal to provide remedies for the alleged price discrimination; we find that even if there was discrimination, Alaska has not made the showing necessary to justify reparations. The Commission also issued a number of orders that either have not jelled in clear enough form for judicial review or present an undue likelihood of piecemeal review; we find these unripe.

We review FERC's orders under the familiar standard for agency actions: we must set them aside if they are not supported by substantial evidence or are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

\* \* \*

*Commission use of rate base balances from the TSM era.* In calculating the maximum just and reasonable rate for service after 2004, it is obviously important to know how much of the rate base (essentially the pipeline's initial capital cost) the carriers had recovered as of December 31, 2004. A just and reasonable rate would allow it to recover thereafter only such sums as it had not recovered before. The carriers had recovered accelerated depreciation under the TSM, and the Commission found that they should use the amounts so calculated to determine the unrecovered balance as of the end of 2004. The Commission rejected their contrary proposal— to use straight-line depreciation figures shown in their filings of FERC Form 6, the carriers' annual financial reports—on the simple ground that it would enable them "to receive

benefits related to accumulated depreciation more than one time." Opinion No. 502, P 76. See also *id*. P 82. The carriers assert before us that there "is also no double-recovery when Opinion No. 154-B is consistently applied, as the Carriers' presentation did," Joint Pet. Br. at 21. While their submission, see Prepared Rebuttal Testimony of Robert G. Van Hoecke, J.A.852, indicates that revenues received under the TSM were less than the hypothetical revenue flow under Opinion No. 154-B, it does not show why this required the Commission to recharacterize TSM return of capital as something different for purposes of estimating the post-TSM rate base balance.

Instead, they claim that FERC's ruling violates their right not to have the TSA used as precedent against them—a right enshrined, as we just saw, in the Commission's approval of the TSA and in our *Arctic Slope* decision affirming that approval. See *Arctic Slope Regional Corporation v. FERC*, 832 F.2d 158, 163 (D.C. Cir. 1987). In a slightly different variant of the same point, they say that the shippers, because they were not parties to the TSA, cannot benefit from it.

But FERC's use of the rate balances created by the TSA's operation is not a "precedential" use of the TSA. Since 1985, the carriers have justified the rates that they charged shippers based on an accelerated depreciation schedule. It makes no difference what the *cause* of the carriers' having characterized a portion of their rates in this manner may have been—the TSA, the tax implications, rolling dice, arm-wrestling, etc. The past is what it was. For the Commission to rely on those justifications to determine how much of the rate base has been recovered is not arbitrary and capricious.

Our rejection of the carriers' claims here encompasses not only those claims related to accelerated depreciation but two additional categories that appear to be functionally equivalent. One of these is $450 million in previously disputed costs that

the carriers amortized under the TSA. The second is "deferred return." This is a sum (1) annually extracted from the inflation component of the nominal rate of return on equity and added to a capital account and then (2) amortized over the capital item's remaining life. Opinion No. 154-B explains the method and provides a helpful mathematical example. See *Williams Pipe Line Co.*, 31 FERC ¶ 61,377 at 61,834; Opinion No. 502 PP 95-102. The carriers do not claim that the Commission has in any way removed from the rate base amounts added thereto (and not amortized by the end of 2004) under the TSM's deferred return system. Rather, at least judging from their briefs before the Commission (which are clearer than the ones filed with us), the claim is that the Commission should have assumed a recovery of deferred return altogether different from what actually happened under the TSM. See Initial Brief of the TAPS Carriers before the Commission at 56-59; Reply Brief of the TAPS Carriers before the Commission at 44-46. We see nothing arbitrary in the Commission's rejection of these claims.

*Starting rate base write-up*. The carriers contend that as part of using Opinion No. 154-B methodology, they are entitled to a one-time "write-up" of their rate base. The claim arises out of the transition from FERC's pre-Opinion No. 154-B regulatory approach and the methodology it adopted in that opinion. In the pre-154-B era, the Commission had used a so-called "valuation rate base," an "arcane" formula representing primarily a weighted average of original and reproduction costs. See *Farmers Union Central Exchange v. FERC*, 734 F.2d 1486, 1495 (D.C. Cir. 1984). Opinion No. 154-B replaced the "valuation" system with a "trended original cost" methodology ("TOC"), which was to apply to all pipelines, new and old. To enable pipelines that had previously used the valuation method to make a smooth transition and to protect the reasonable expectations of their investors, Opinion No. 154-B provided that such pipelines would be entitled to a one-

time increase of their rate base. 31 FERC ¶ 61,377, 61,835-36. See also *Lakehead Pipe Line Company, L.P.*, 71 FERC ¶ 61,338, 62,309 (1995). In the current proceeding FERC refused to allow the TAPS carriers any comparable write-up.

FERC never approved valuation-based rates for the TAPS pipeline. Opinion No. 502, P 114. To be sure, the carriers filed rates between 1977 and 1985 using valuation methodology, see *Trans Alaska Pipeline System*, 355 ICC 80, 84-86 (1977) (establishing interim rates for TAPS using valuation methodology), but in fact, as the carriers' own expert witness Dr. Joseph Kalt acknowledged, the rates finally adopted were based on the TSM, which called for a TOC methodology akin to that specified by Opinion No. 154-B. See Opinion No. 502, P 114. Accordingly, by the time of the TSA any reasonable investor would have abandoned any hopes in the valuation methodology. Thus, neither the transition theory nor the interest in protecting investor expectations called for a rate base write up. The Commission's rejection of the claim was anything but arbitrary and capricious.

*Treatment of 2005 depreciation in rate base calculation for 2006*. Although FERC's rulings for 2005 implied a different calculation of unrecovered rate base than would have occurred had FERC continued with the TSM, the Commission nonetheless computed a starting rate base balance for 2006 as if the 2005 rates had been calculated under the TSM. The carriers claim that this renders the Commission's calculation of unrecovered rate base for 2006 inaccurate and arbitrary.

The Commission's primary response is that any such miscalculation had no impact. The just and reasonable rates calculated for 2006 were well below the 2004 rate, but the Commission had no authority to provide a remedy for shippers that would reduce the net unrefunded charges below

the 2004 level. As a result, the miscalculation alleged had no impact on the rates and refunds at issue here. First Rehearing Order, P 83. The carriers acknowledge the absence of any impact on the 2006 refunds, Pet. Reply Br. at 14, and the Commission in this proceeding made no final ruling on rates to be in effect thereafter.

*Use of a "new" methodology as a basis for ordering refunds under ICA § 15(7).* The carriers invoke our decision in *Sea Robin Pipeline Co. v. FERC*, 795 F.2d 182 (D.C. Cir. 1986), for the proposition that in a proceeding under ICA § 15(7) the Commission cannot order refunds when its calculation of the just and reasonable rates depends on a methodology different from the one employed for the pre-existing pipeline-filed rate. The carriers are quite wrong, but it is a little complicated to explain why.

First, we note that the carriers' reliance, in an ICA proceeding, on a Natural Gas Act ("NGA") case such as *Sea Robin* is orthodox and presumptively permissible. We have recognized the similarity between the operative language of §§ 15(7) and 15(1) of the ICA and of §§ 4 and 5 of the NGA, and have relied on cases interpreting one act to decide cases under the other. See *Association of Oil Pipe Lines v. FERC*, 83 F.3d 1424, 1440-41 (D.C. Cir. 1996) (analogizing §§ 15(7) and 15(1) of the ICA to §§ 4 and 5 of the NGA). We say "presumptively permissible" because the statutes are not exact carbon copies; the assumption of similarity is not absolute. Here, however, we assume in the carriers' favor that the message of *Sea Robin* is fully applicable. The carriers' problem is that they have misread the message.

*Sea Robin* involved the often critical issue of the burden of proof under different sections of the NGA. Under § 4, a carrier can file an increase in rates, and, if the rates are challenged, can sustain the increase only if it meets the burden

of showing that the new rates are just and reasonable. If it fails, then refunds are ordered that have the effect of limiting the carrier's charges to those prevailing before the filing. See *Amoco Production Co. v. FERC*, 271 F.3d 1119, 1122 (D.C. Cir. 2001) (holding that "the pre-existing lawful rate" set a floor beneath which FERC could not order refunds, despite its conclusion that the just and reasonable rate for that period was lower); *Distrigas of Massachusetts Corp. v. FERC.*, 737 F.2d 1208, 1222-24 (1st Cir. 1984). This parallels ICA § 15(7); our immediately preceding discussion of the rates and refunds for 2006 reflects this understanding.

By contrast, in a proceeding under § 5 of the NGA the Commission evaluates a pre-existing rate. Before setting it aside, the Commission must carry the burden of showing that that rate is unjust and unreasonable. If it succeeds, it can limit rates to a newly determined just and reasonable level, but can do so only prospectively. This parallels action under ICA § 15(1).

*Sea Robin* involved a complex interaction of carrier filings and Commission initiatives. Although the precise moves and countermoves at issue aren't altogether clear, the carriers fix on the following passage:

> The rate methodology FERC imposed on Sea Robin was not proposed by the pipeline; thus, the order cannot represent an approval, in whole or part, of changes suggested by Sea Robin. Nor was the Commission's methodology a return to Sea Robin's pre-filing rates; the order, in other words, also does not represent a rejection of proposed new rates and a reinstatement of old, established rates. The Commission's action, therefore, does not fall into the narrow section 4 range of acceptance.

795 F.2d at 187 (quoted in Pet. Br. at 35-36). The carriers propose to extend *Sea Robin*'s message about NGA § 4 to ICA § 15(7)—itself a perfectly permissible move. And they contend that, as the Commission dropped the TSM and adopted the Opinion No. 154-B methodology, the first quoted sentence bars the Commission, in this § 15(7) proceeding, from limiting the carriers' 2005 and 2006 rates to those previously in place.

But the next quoted sentence destroys that claim. All the Commission has done here is to limit the 2005 and 2006 charges to those prevailing in 2004—in the words of *Sea Robin*, to the carriers' "pre-filing rates." *Id.* See also *East Tennessee Natural Gas Co. v. FERC*, 863 F.2d 932, 942 (D.C. Cir. 1988).

Consider briefly the effect of the carriers' extravagant reading of the first sentence. If the Commission cannot test the newly filed rates by a new methodology, any rate increase running afoul of a new Commission methodology would not be subject to § 15(7) refund obligations. Carriers would have an incentive to shout "new methodology!" whenever they could detect the slightest change in the Commission's ratemaking principles or policy, and the Commission and courts would have to parse the newness of any such principle or policy. We see nothing in *Sea Robin* imposing such an unwieldy and elusive burden on the Commission.

*Alaska's claim for refunds for alleged discriminatory rates*. In June 2004, the Regulatory Commission of Alaska ordered the TAPS carriers to use a new ratemaking methodology for setting intrastate rates, and, applying the methodology, lowered the intrastate rate from $3.00 to $3.20 per barrel to $1.96 per barrel. Alaska Pet. Br. at 9. This left the carriers' filed interstate rates for 2005 and 2006 substantially higher than the intrastate rates. Seeing the

interstate rates as having an adverse effect on its royalty and tax income, Alaska (but not any of the shippers) claimed that the interstate rates filed by the carriers for 2005 and 2006 were unduly discriminatory in violation of §§ 2 and 3(1) of the ICA and § II-11(e) of the TSA; it asked FERC to order refunds of the full amount of the difference between the carriers' proposed 2005 and 2006 interstate rates and their RCA-limited intrastate rates. See Opinion No. 502, PP 252, 257, 265.

If rates are discriminatory within the meaning of the ICA, §§ 2 and 3(1) allow even a shipper paying only a just and reasonable rate nevertheless to recover damages from the discrimination. *ICC v. United States ex rel. Campbell*, 289 U.S. 385, 390 (1933). The amount of damages may be more or less than the disparity in rates, and "is something to be proved and not presumed." *Id*. The relevant question is not "how much better off the complainant would be today if it had paid a lower rate. The question is how much worse off it is because others have paid less." *Id.* As that formulation of the "question" makes clear, the nub of the issue is competitive injury. See also, e.g., *Harborlite Corp. v. ICC*, 613 F.2d 1088, 1091-92 (D.C. Cir. 1979).

It is perhaps a metaphysical question whether a rate that causes no competitive injury could be considered discriminatory. But assuming *arguendo* that the disparate inter- and intrastate rates were discriminatory, Alaska could "recover only the actual damages it has suffered in the marketplace as a result of the discriminatory rate." *Council of Forest Industries v. ICC*, 570 F.2d 1056, 1060 & n.10 (D.C. Cir. 1978); Opinion No. 502, P 267. Alaska has shown no competitive injury. We are not sure how a non-shipper complainant, with interests such as those of the state of Alaska, would show competitive injury; after all, it is not in the business of making sales of oil transported on the pipeline.

In any event, the difficulties confronting a non-shipper don't excuse it from the need to offer such proof.

Alaska suggests that a casual remark by the Commission in *Cook Inlet Pipe Line Co.*, 47 FERC ¶ 61,057, *reh'g denied*, 47 FERC ¶ 61,393 (1989), represents a holding that a disparity between interstate and intrastate rates gives rise, ipso facto, to a remedy under ICA § 2. Whatever FERC may have meant, it had no power to sweep aside a century of Supreme Court cases construing the ICA.

In its petition for review Alaska argues that § II-11(e) of the TSA may be construed to afford Alaska a remedy not available under the ICA. Alaska Pet. Br. at 31. This seems unlikely, as the language of § II-11(e) appears merely to preserve Alaska's anti-discrimination rights under the ICA. But in any event, Alaska never raised this point before the Commission in its Brief on Exceptions, arguing instead that the TSA did not *limit* its statutory rights in the event of discrimination. Alaska Br. on Exceptions, July 9, 2007, at 27-28.

Finally, we see nothing in FERC's authority to award refunds on shippers' complaint under ICA §§ 13, 16, see *BP W. Coast Prods., LLC v. FERC*, 374 F.3d 1263, 1305 (D.C. Cir. 2004), that would encompass claims to reparations for discrimination without a showing of competitive harm.

\* \* \*

Besides the claims discussed above, petitioners object to several rulings by the Commission relating to the expected costs of dismantlement and removal of the pipeline, and of restoration of the land (the "DR&R" costs), and to rates to be collected after 2006. With a trivial exception we find these unripe.

*DR&R costs*. The Commission ruled that if the accumulated prepayments made by shippers to fund these costs, plus the earnings imputed to them, proved to exceed the actual DR&R costs, the carriers would have to refund the surplus (the Commission does not say how such a refund is to be allocated among shippers over the pipeline's long history). It also stated the principles that would govern the imputation of earnings to these accumulated prepayments, namely Moody's Aa bond rate for the years 1977 through 2005 and the TAPS carriers' weighted cost of capital for 2006 on. Finally, it ordered the carriers to compile records to account for the potential DR&R refund liability.

When considering ripeness, the court must balance "the fitness of the issues for judicial decision" against the "hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967); *Nat'l Treasury Employees Union v. United States*, 101 F.3d 1423, 1431 (D.C. Cir. 1996). An agency decision may be fit for judicial review when the disputed issue is purely legal, and when no institutional interests favor the postponement of review. *Public Service Electric & Gas Co., v. FERC*, 485 F.3d 1164, 1168 (D.C. Cir. 2007). Even though the legal issues may be clear, a case may not be ripe for review when it would be inappropriate for a court to spend scarce resources on claims that, "though predominantly legal in character, depend[] on future events that may never come to pass, or that may not occur in the form forecasted." *Devia v. NRC*, 492 F.3d 421, 425 (D.C. Cir. 2007) (citing *McInnis-Misenor v. Maine Medical Center*, 319 F.3d 63, 72 (1st Cir. 2003)).

The carriers contend that FERC's refundability order poses a purely legal issue, one that is thus "presumptively reviewable." *Sabre, Inc. v. DOT*, 429 F.3d 1113, 1119 (D.C. Cir. 2005). Moreover, they assert that FERC's rulings cause

them significant and immediate hardship because the resulting uncertainty will injure the value of the firms' stock.

Though the case is close, we think the challenge unripe (with an exception to be addressed shortly). First, it is unclear whether the refund obligation will ever materialize. That depends on whether the costs of whatever dismantlement, removal and restoration duties may be imposed prove to be greater than, less than or about equal to the prepayments and the imputed earnings thereon. While there is uncertainty as to whether any refunds will be ordered, there is no evidence that they will be significant; so the effect of the uncertainty on investor assessment of the carriers' financial position seems likely to be minor. Finally, any ultimate order of refunds seems likely to encounter a host of additional issues (such as which shippers the refunds would go to), all of which are better resolved in one case rather than piecemeal. Thus the case is one where adjudication now would lead to "piecemeal review which at the least is inefficient and upon completion of the agency process might prove to have been unnecessary." See *FTC v. Standard Oil Co.*, 449 U.S. 232, 242 (1980).

The Commission's order that the carriers account for these prepayments on their Form 6 filings of course involves an immediate change in conduct. The Commission itself does not seriously assert unripeness. The carriers' objection here is the same as their objection to the Commission's order that sums unused for DR&R must be refunded to the shippers— namely, that this involves retroactive ratemaking. Indeed, to the extent that the Form 6 accounting were seen as prejudging the issue of a duty to pay over the hypothetical surplus, the two issues would seem to merge. But insofar as the Commission's accounting order merely requires a segregated account, its ultimate disposition being unresolved, the order does not appear equivalent to retroactive ratemaking. Accordingly, on the understanding that our decision on the

accounting mandate in no way forecloses the carriers' claims as to the status and disposition of the funds, we reject their objection to the accounting order.

*Future "uniform rates" and "pooling."* Another carrier challenge is to FERC's instructions to them to file "uniform rates" and to employ a "pooling" mechanism (the latter a response to the fact that the carriers vary in the relationship between their ownership shares and the amounts they ship). Both issues are currently being litigated before the Commission. See *BP Pipelines (Alaska) Inc.*, 127 FERC ¶ 61,316 (2009); *Unocal Pipeline Co.*, 129 FERC ¶ 61,275 (2009). All parties recognize that the ultimate form of pooling (if any) is completely unknown. Despite FERC's seemingly unequivocal instructions to the carriers to file uniform rates, FERC does not seem to contemplate sanctioning them for failure to agree. Oral Arg. Tr. at 25-26. Delaying review will not only avoid our becoming entangled in the meaning and validity of as yet inchoate rules, see *Abbott Laboratories*, 387 U.S. at 148-49, but will give FERC "an opportunity to correct its own mistakes and to apply its expertise," *FTC v. Standard Oil*, 449 U.S. at 242.

* * *

We have examined all the petitioners' contentions and, except for those found unripe, reject all; to the extent that we have not discussed particular ones, it is only because of the obviousness of the grounds for rejection. Thus, except as to the claims found unripe, we affirm FERC's orders in all respects.

*So ordered.*