# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued December 8, 2014      Decided February 20, 2015

No. 13-1248

TESORO ALASKA COMPANY,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

BP PIPELINES (ALASKA) INC., ET AL.,
INTERVENORS

———

Consolidated with 13-1249

———

On Petitions for Review of an Order of
the Federal Energy Regulatory Commission

———

*Robin O. Brena* argued the cause for petitioners. With
him on the joint briefs were *Anthony S. Guerriero*, *Kelly M.
Helmbrecht*, *Joseph Koury*, and *Andrew T. Swers*. *David W.
Wensel* entered an appearance.

*Beth G. Pacella*, Deputy Solicitor, Federal Energy
Regulatory Commission, argued the cause for respondent.

With her on the brief were *David L. Morenoff*, General Counsel, and *Robert H. Solomon*, Solicitor.

*Charles F. Caldwell* argued the cause for respondent intervenors. With him on the brief were *Dean H. Lefler*, *Steven H. Brose*, *Steven Reed*, *Daniel J. Poynor*, *Eugene R. Elrod*, *Christopher M. Lyons*, and *J. Patrick Nevins*. *Elizabeth B. Kohlhausen* and *Ruth M. Porter* entered appearances.

Before: GRIFFITH, KAVANAUGH and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*: The Trans Alaska Pipeline System (TAPS) runs for 800 miles from Prudhoe Bay on Alaska's North Slope to a southern terminus at Port Valdez. TAPS is jointly owned by the three TAPS Carriers, BP Pipelines (Alaska) Inc., ConocoPhillips Transportation Alaska, Inc., and ExxonMobil Pipeline Company. The crux of the consolidated Petitions before us is a challenge to the authority of the Federal Energy Regulatory Commission (FERC) to approve a cost pooling agreement among the Carriers that allocates most fixed costs on the basis of each Carrier's share of combined interstate and intrastate utilization of TAPS.

TAPS carries a common stream—that is, the oil in the pipeline from different shippers headed to different destinations is comingled in transit. The Carriers have an undivided joint ownership interest in TAPS, which is operated by the Carriers' agent, Alyeska Pipeline Service Company. Each Carrier is entitled to control capacity corresponding to its percentage ownership share. A shipper seeking to move

oil on the pipeline must pay one of the Carriers for "nominating" oil from one point on the pipeline to another, and the shipper adds to and withdraws from the common stream accordingly. TAPS is used for both interstate shipping (where the oil is destined for points beyond Alaska, via the Valdez Marine Terminal), and intrastate shipping (where the oil is destined for a refinery within the state). Under a complex regulatory structure, FERC is empowered to set maximum rates for interstate service and the Regulatory Commission of Alaska (RCA) is empowered to do the same for intrastate service. Although each Carrier may sell shipment rights on TAPS, the service is provided entirely by Alyeska rather than by the Carrier itself—in other words, the three Carriers offer literally identical service.

A settlement reached in 1985 governed TAPS rates smoothly for three decades, and the current controversy arose when that settlement expired. Following several years of disputes (with each other, with FERC, with RCA, and with shippers), the Carriers entered into a new settlement agreement, effective August 1, 2012. The settlement includes a pooling structure by which fixed costs are allocated to each Carrier based on total traffic, including both interstate and intrastate traffic. Petitioners Tesoro Alaska and Anadarko Petroleum, which ship oil on the pipeline between points *within* Alaska, challenge FERC's approval of that settlement.

Petitioners argue, first, that FERC misunderstood and exceeded its statutory authority; second, that including intrastate traffic in the pooling agreement was improper regulation of intrastate commerce; and third, that FERC's approval of the settlement failed various requirements of the Administrative Procedure Act (APA). For the reasons described in detail in this opinion, we find that FERC did have statutory authority to approve the settlement; did not

improperly regulate intrastate commerce; and did comply with APA requirements in reaching the order challenged here. Accordingly, we deny the Petitions.

**I.**

This Court has previously had occasion to describe the backstory of TAPS:

> [A]fter the discovery of vast oil reserves on the North Slope of Alaska in 1969, various oil companies constructed an 800-mile pipeline from the Prudhoe Bay field south to the warm water port of Valdez. From rather modest estimates at the outset, TAPS was ultimately completed at a cost of over $9 billion. Oil started to flow through TAPS in the summer of 1977 and has continued since.

*Arctic Slope Reg'l Corp. v. FERC*, 832 F.2d 158, 160 (D.C. Cir. 1987).

The original maximum rates for shipping oil on TAPS were hotly contested. *Id.* But following protracted litigation, the TAPS Carriers and Alaska reached a settlement agreement in 1985 that determined maximum rates and provided for annual rate-setting through 2011, the end of the pipeline's then-projected useful life (although provisions existed for earlier termination of the settlement).[1] *See id.* at 161. In

---

[1] FERC explains to us that the number of TAPS Carriers has varied over time: originally there were eight, and now there are three. Unocal Pipeline Company, which appears in this case as intervenor for FERC alongside the three current TAPS Carriers, represents that it provided final notice of withdrawal from TAPS effective August 1, 2012; is not a party to the agreement challenged in this case; and

practice, the 1985 agreement governed TAPS interstate rates without controversy through 2004.

When the Carriers filed rates for 2005 and 2006, the State of Alaska and two shippers (Tesoro and Anadarko, petitioners in this case) protested to FERC, arguing that the rates were unjust, unreasonable, and otherwise unlawful. In response, FERC scuttled the 1985 agreement and applied the general methodology for oil pipeline ratemaking. *BP Pipelines (Alaska) Inc. v. BP Pipelines (Alaska) Inc.*, 123 FERC ¶ 61,287 (2008) ("Opinion No. 502"). Various entities petitioned this Court for review of FERC's decision, and we rejected some challenges to Opinion No. 502 and found others unripe. *See Flint Hills Res. Alaska v. FERC*, 627 F.3d 881 (D.C. Cir. 2010).

The present Petitions arise from rate filings beginning in 2009, which were separately disputed. On September 25, 2012, the Carriers filed two proposed settlements—one retrospective and one prospective—to resolve the contested issues before FERC. Only the prospective settlement, which sets forth a cost pooling agreement among the Carriers to be implemented beginning August 1, 2012 ("Pooling Agreement"), is challenged in these Petitions.

The Pooling Agreement provides for pooling of fixed expenses of TAPS (that is, expenses required to keep TAPS operational for all traffic, including both interstate and intrastate service). Petitioners complain—before the Commission and in these Petitions—that they are harmed by cost pooling in that it disincentivizes the Carriers from

is in the process of completing the transfer of its TAPS interests to the current Carriers.

competing on price in the rates charged to independent shippers such as themselves for intrastate shipments.

A settlement judge appointed on order of the Commission, *BP Pipelines (Alaska) Inc.*, 139 FERC ¶ 61,065 (2012), identified contested issues for the Commission in a report dated January 8, 2013, *BP Pipelines (Alaska) Inc.*, 142 FERC ¶ 63,006 (2013).[2] On July 16, 2013, the Commission approved the Pooling Agreement in the order on review in these Petitions. *BP Pipelines (Alaska) Inc.*, 144 FERC ¶ 61,025 (2013) ("Order on Contested Settlement").

This Court has jurisdiction to review the Commission's order under the Interstate Commerce Act, 49 U.S.C. App. § 13(6)(b) (1988).[3] These Petitions were timely filed within 60 days of the order as required by the statute. *See id.* The ICA has no requirement to seek agency rehearing prior to judicial review. *Id.*

## II.

In inquiring whether FERC acted beyond its statutory authority, we apply *Chevron*'s two-part test to the agency's

---

[2] Under FERC's procedure, the settlement judge does not certify a contested offer or make substantive findings, but instead "must report to the Commission that the settlement is contested and identify the matters at issue." *BP Pipelines (Alaska) Inc.*, 142 FERC ¶ 63,006 at P 254 (2013).

[3] In 1977, "Congress transferred regulatory authority over oil pipelines from the Interstate Commerce Commission to FERC. FERC's regulation of oil pipelines is governed by the ICA as it existed on October 1, 1977." *Flint Hills*, 627 F.3d at 884 n.1. The Interstate Commerce Act was last reprinted in the 1988 edition of the U.S. Code. *See* 49 U.S.C. App. (1988).

interpretation of the laws empowering it. *See City of Arlington v. FCC*, 133 S. Ct. 1863, 1874-75 (2013) (citing *Chevron USA Inc. v. Natural Res. Def. Council*, 467 U.S. 837 (1984).

FERC orders themselves are reviewed under "the familiar standard for agency actions: we must set them aside if they are not supported by substantial evidence or are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Flint Hills*, 627 F.3d at 884 (quoting 5 U.S.C. § 706(2)(A)). We give "special deference" to FERC's expertise in ratemaking cases, reviewing the Commission's decision only to determine whether it "has examined the relevant data and articulated a rational connection between the facts found and the choice made." *BP W. Coast Prods., LLC v. FERC*, 374 F.3d 1263, 1282 (D.C. Cir. 2004). The Commission, however, must still "cogently explain why it has exercised its discretion in [the] given manner." *Id.* (quoting *Exxon Corp. v. FERC*, 206 F.3d 47, 54 (D.C. Cir. 2000)).

## A.

Petitioners' first argument is that FERC exceeded its statutory authority in approving the Pooling Agreement. Specifically, Petitioners argue that although the Interstate Commerce Act (ICA) empowers FERC to regulate *inter*state commerce, it "does not grant FERC authority to regulate *intra*state commerce, to pool *intra*state costs, or to eliminate competition among *intra*state carriers through the pooling of *intra*state costs."

Indeed, FERC is a creature of statute, and "if there is no statute conferring authority, FERC has none." *Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 8 (D.C. Cir. 2002). So, the key

question before this Court is whether the Interstate Commerce Act—and the 1977 transfer of oil pipeline jurisdiction to FERC—conferred the statutory authority to approve pooling of intrastate costs as well as interstate costs.

We begin our analysis, as always, with the statutory text. *See Am. Fed'n of Gov't Emps., AFL-CIO, Local 3669 v. Shinseki*, 709 F.3d 29, 33 (D.C. Cir. 2013) (citing *Chevron*, 467 U.S. at 842). The provision invoked by the Commission as the source of its authority, ICA § 5(1), states in relevant part:

> Except upon specific approval by order of the Commission as in this section provided . . . it shall be unlawful for any common carrier subject to this chapter . . . to enter into any contract, agreement, or combination with any other such common carrier or carriers for the pooling or division of traffic, or of service, or of gross or net earnings, or of any portion thereof; . . . *Provided*, That whenever the Commission is of opinion, after hearing upon application of any such carrier or carriers or upon its own initiative, that the pooling or division, to the extent indicated by the Commission, of their traffic, service, or gross or net earnings, or of any portion thereof, will be in the interest of better service to the public or of economy in operation, and will not unduly restrain competition, the Commission shall by order approve and authorize, if assented to by all the carriers involved, such pooling or division, under such rules and regulations, and for such consideration as between such carriers and upon such terms and conditions, as shall be found by the Commission to be just and reasonable in the premises . . . .

The key textual language here gives FERC power to regulate the common *carrier* (rather than, for example, an interstate service offering). In ICA § 1(3), "common carrier" is defined to "include all pipe-line *companies*," rather than pipeline *rates* (emphasis added). Given that there is no dispute that the relevant parties to the settlement are common carriers in interstate service, we can find under *Chevron* step one that the ICA gives FERC authority over intrastate traffic—at least, where FERC has found it a necessary incident to regulation of interstate traffic.[4]

Petitioners make a handful of arguments in an attempt to defeat this conclusion. First, they rely on language in *Exxon Pipeline Co. v. United States*, in which this Court stated in a footnote that on October 1, 1977, "jurisdiction over the transportation of oil in interstate commerce by pipeline was transferred to FERC." 725 F.2d 1467, 1468 n.1 (D.C. Cir. 1984). Petitioners would read this as a modification of the ICA that excludes *intrastate* authority of any kind. But it cannot be that explanatory language from one of our opinions—appearing in a footnote, no less—would modify the Department of Energy Organization Act, which merely "transferred to, and vested in, [FERC] all functions and authority of the Interstate Commerce Commission . . . where the regulatory function establishes rates or charges for the transportation of oil by pipeline or establishes the valuation of any such pipeline." Pub. L. No. 95-91, 91 Stat. 565, 584 (1977).

---

[4] FERC devotes part of its brief to defending its action through non-encroachment on state regulatory authority. But the RCA's non-challenge to FERC's approval of the Pooling Agreement does not change the legal analysis in this case: There is no question that Congress *could* have preempted any and all state regulation of TAPS, so the inquiry collapses back into the statutory construction question of whether and to what extent it actually did.

Next, Petitioners point to provisions of ICA § 1(1) as limiting FERC's scope of oil pipeline regulation to movements in interstate commerce. The language they cite reads: "The provisions of this chapter shall apply to common carriers engaged in . . . [t]he transportation of oil . . . by pipe line . . . from one State . . . to any other State. . . ." ICA § 1(1).

Petitioners reason that this "limits the scope of oil pipeline regulation, and indeed the scope of the Act itself, to movements in interstate commerce." This ignores the fact that ICA § 1(1), like the text of § 5(1), applies to "common carriers" and not directly to rates. Petitioners also point to ICA § 1(2), which states that "[t]he provisions of this chapter . . . shall not apply . . .[t]o the transportation of passengers or property . . . wholly within one State . . . ." But there is no dispute that FERC lacks a general regulatory power over oil in intrastate commerce. The controlling question in this case is whether incidental regulation of intrastate commerce is authorized. Even if *we* thought the best reading was that incidental regulatory power was not allowed under the plain language of ICA § 5(1) standing alone, it is still a reasonable interpretation under *Chevron* step two to look at ICA § 1 and § 5 together and conclude that incidental regulation is permitted.

Indeed, case law cited by Petitioners themselves supports this reading. In *Texas v. E. Tex. R.R. Co.*, the Supreme Court held that approval by the Interstate Commerce Commission of abandonment of a rail line did not preempt the requirement to seek state approval for abandonment of the same line that also carried interstate traffic. 258 U.S. 204 (1922). But the opinion noted: "As a whole these acts show that what is intended is to regulate interstate and foreign commerce and to

affect intrastate commerce only as that may be incidental to the effective regulation and protection of commerce of the other class." *Id.* at 217.

At oral argument, Petitioners contested the applicability of this incidental impact precedent, claiming that in approving the settlement challenged here, FERC had decided to "cross over and start to regulate state commerce" without any reason "at all." But that concedes the statutory interpretation point and opens the question of whether, in approving a TAPS Pooling Agreement that factored intrastate traffic, FERC was only incidentally affecting intrastate commerce (as it claims) or was directly regulating it (as Petitioners claim).

**B.**

Was the Pooling Agreement's factoring of intrastate traffic in allocating fixed costs merely incidental to the regulation of interstate commerce? We find that FERC reasonably concluded that it was. TAPS has fixed costs regardless of the quantity and nature of actual oil shipment traffic, and the Pooling Agreement simply allocates those costs based on total usage rather than on interstate traffic alone. A contrary decision would force subsidization of intrastate service by interstate shippers.[5] It is obvious why

---

[5] The point is illustrated by a simplified pipeline system model with total capacity of 100 units and fixed costs of $100 shared by two Carriers, A and B, that have equal ownership shares and may carry both interstate and intrastate traffic. If Carrier A uses 30 units of capacity for interstate traffic and Carrier B uses 10 units of capacity for interstate traffic, a cost pooling agreement (assuming 100 percent of fixed cost re-allocation, which is not the case in the Pooling Agreement on review) would require Carrier A to reimburse Carrier B for $25 (assuming each already has paid $50 to cover its pro rata ownership share of the operating costs). Under

intrastate shippers such as Petitioners here would find that desirable, but it is not an arrangement commanded by the ICA.

Of course this must be FERC's analysis, not ours, and we think it was. In a prior order, the Commission had adopted an Administrative Law Judge's conclusion that uniform rates were in the public interest because they would minimize annual filings and result in a single calculation of a "just and reasonable" rate for identical service provided by the same operator. Opinion No. 502, 123 FERC ¶ 61,287 at PP 1-2. Indeed, in that order the Commission referenced an Administrative Law Judge's finding that allowing differences among the Carriers' interstate rates caused variation from year to year because they had free reign to set rates, and the

---

that scenario, Carrier A will be using 75% of the capacity of the pipeline and will pay $75 of the $100 in fixed costs. Now, assuming that intrastate costs are excluded from pooling, suppose that Carrier B sells an additional 10 units of capacity to intrastate shippers at a rate at or slightly above its variable costs for shipment. Carrier A will still pay $70 of $100 in fixed costs of the pipeline even though it is now using only 60% of the capacity (because it ships 30 units interstate, while Carrier B ships 10 units interstate, for which fixed costs are allocated by pooling; while fixed costs apportionable to Carrier B's 10 intrastate units are allocated by ownership share). Again, this model simplifies many aspects of the facts relating to TAPS that were before the Commission, but it demonstrates the rationale for a pooling of costs that accounts for both interstate and intrastate traffic. Where there are more than two carriers and unequal ownership shares (as is the case for TAPS), the economic incentive on the lowest-ownership carrier to discount intrastate service will be much more substantial absent a pooling agreement that factors it into the cost settlement mechanism.

resulting market pricing was "unduly discriminatory and unjust and unreasonable."[6] *Id.* at P 237.

In the order that is the subject of these Petitions, FERC referenced Opinion No. 502's mandate for uniform rates and observed that a cost pooling mechanism was required to make uniform rates work and to support the future, long-term operation of TAPS. Order on Contested Settlement, 144 FERC ¶ 61,025 at P 60-61. FERC invoked ICA § 5(1) and made the necessary finding that "the Pooling Agreement is in the interest of better service to the public, as well as economy in service, and that it will not unduly restrain competition." *Id*. at P 55. In light of the unusual nature of the market for shipment on TAPS, we hold that this was sufficient articulation of a rationale justifying the incidental effect on intrastate commerce challenged here.

## C.

Petitioners' final attempt to defeat the Pooling Agreement is to raise various challenges under the Administrative Procedure Act as to whether FERC properly applied ICA § 5(1) in approving the settlement. Petitioners invoke everything but the proverbial kitchen sink, arguing that FERC misapplied its contested settlement standard, misapplied the "just and reasonable" standard, failed to support its decision with substantial evidence, failed to respond to Petitioners' arguments and evidence, improperly relied on an Administrative Law Judge's decision as a benchmark, improperly relied on its interstate uniform rate ruling, failed to explain departure from its own precedent, improperly relied

---

[6] That conclusion—in a separate proceeding about interstate tariffs to which Petitioners have not claimed they are subject—is not (and cannot be) challenged in these Petitions.

on extra-record evidence, and misallocated the burden of proof in its proceedings.[7]

Although we have reviewed each of Petitioners' assertions individually, we think it adequate to briefly describe our analysis that FERC did not act arbitrarily or capriciously and had sufficient evidence for its findings, including the ultimate required finding that the Pooling Agreement was "in the interest of better service to the public or of economy in operation, and will not unduly restrain competition." ICA § 5(1).

On the basis of its determination in Opinion No. 502 that uniform interstate rates were appropriate (not challenged and not subject to review in this case), the Commission reasonably found the Pooling Agreement "is in the interest of better service to the public, as well as economy in service." Order on Contested Settlement, 144 FERC ¶ 61,025 at P 55. Contrary to Petitioners' assertions, FERC *did* address competitiveness arguments: the Commission found that excluding 25.1 percent of the total TAPS cost of service provided ample incentive for each Carrier to discount rates (from the uniform maximums) to compete for volumes. *Id.*

---

[7] Citing *ExxonMobil Oil Corp. v. FERC*, 487 F.3d 945, 962 (D.C. Cir. 2007), FERC contends that Petitioners are precluded from judicial review on these claims because they did not previously raise them with FERC. But as we explained in *CSX Transportation, Inc. v. Surface Transportation Board*, 584 F.3d 1076, 1079 (D.C. Cir. 2009), the *ExxonMobil* rule cannot apply where the petitioner had no opportunity to raise an issue until the agency issued its final rule. Given that each of the claims raised deals with FERC's treatment of evidence or reasoning in its final opinion, *CSX* requires that Petitioners be able to raise them for judicial review.

at P 62. Petitioners view this differently, of course—they argue that pooling leads to less incentive to discount, and that leads to higher rates.[8] If followed to its conclusion, however, Petitioners' argument would require FERC to ignore intrastate traffic in approving pooling so that competitive discounting would drive intrastate prices down to the (relatively small) variable expense.[9] The question FERC was required to resolve cannot be (as Petitioners would have it) merely whether the Pooling Agreement "restrained competition," because as a matter of economics every pooling arrangement unquestionably does. Hence, the ICA disallows pooling agreements absent regulatory approval. Rather, the statutory question is whether the Pooling Agreement "*unduly* restrained competition." ICA § 5(1) (emphasis added). FERC reasonably exercised its judgment that the inherent restraint was not *undue* because of the 25.1 percent exclusion. FERC's determination—that a 25.1 percent exclusion of costs from pooling provided an adequate incentive to compete and to discount—was facially reasonable.

---

[8] The parties dispute whether BP's actual intrastate rate increase (since the Pooling Agreement became effective) is admissible at this stage, but we need not decide the question. Even assuming it was, it would not change our analysis.

[9] Another justification by FERC for its exercise of authority is that even though it lacks plenary authority to regulate intrastate commerce, there is no bar to its consideration of the impact of intrastate commerce on interstate rates. *See Transm. Agency of N. Cal. v. FERC*, 495 F.3d 663, 667 (D.C. Cir. 2007) (holding that FERC may consider the rates of a non-regulated utility "to the extent that they affect the rates" of the regulatory target); *see also Fed. Power Comm'n v. Texaco, Inc.*, 417 U.S. 380, 401 (1974) (permitting "indirect regulation" of non-regulated entities in service of its duty to insure pipeline rates are "just and reasonable").

Petitioners say FERC did not go far enough in protecting competition. But the consequence of their position would be to entitle them to a market in which Carriers would have no incentive to set intrastate rates that contribute toward overall cost recovery for TAPS construction, maintenance and operation, and future decommissioning (that is, where the cost pooling agreement would cause the Carrier's intrastate cost of service to approach the variable cost). It is certainly in Petitioners' economic interest to seek such an outcome, but Petitioners have not shown that FERC was required to mandate it to the detriment of the economics of the overall pipeline system.

The record shows that FERC discussed the impacts both of non-pooling and of pooling, and struck a reasonable balance between the two. On judicial review, there is limited scope for questioning the agency's exercise of the discretion inherent in this balancing. Petitioners here have not produced a compelling reason to upset the Commission's judgment.

## III.

In sum, we find: (i) that the Interstate Commerce Act permits incidental regulation of intrastate commerce pursuant to approval of a pooling agreement under § 5(1); (ii) that any regulation of intrastate commerce challenged here was incident to the Pooling Agreement that FERC found just and reasonable for interstate commerce; and (iii) that the Commission did not act arbitrarily or capriciously in approving the Pooling Agreement or make findings unsupported by the evidence. Accordingly, we deny the Petitions for review.

*So ordered.*